UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

ANASTASIOS THOMAS BELESIS and ATB
HOLDING COMPANY, LLC,

                   Plaintiffs,

   -v-

SAMUEL D. WAKSAL, individually and as the Founder,
Chief of Innovation, Science and Strategy, and Chairman
of the Board of Kadmon Pharmaceuticals, LLC, and
Kadmon Corporation, LLC, KADMON
PHARMACEUTICALS, LLC, KADMON
CORPORATION, LLC, KADMON HOLDINGS, LLC,
and all other corporate entities operating under the
KADMON name, and STEVEN GORDON, as Executive
Vice President, General Counsel, and Chief
Administrative, Compliance and Legal, Officer of
Kadmon Pharmaceuticals, LLC, and Kadmon
Corporation, LLC,

                   Defendants.

------------------------------------------------------------------X

15 Civ. 5048 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

On September 29, 2016, the Court (per the Honorable Analisa Torres, to whom this matter was then assigned) dismissed, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the original complaint in this action, which brought three federal securities fraud claims and state law claims sounding in breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, unjust enrichment, misrepresentation, and tortious interference. *See* Dkt. No. 30 ("Sept. 29 Op."). Plaintiffs now move, under Federal Rule of Civil Procedure 15(a), for leave to file an amended complaint. Dkt. No. 35. Because amendment would be futile, the Court denies the motion.

I.   **Background**[1]

   A.   **The Parties**

Plaintiff Anastasios Belesis is a New York-based broker-dealer who was the CEO of John Thomas Financial ("JTF"), a financial services firm that closed in July 2013. Compl. ¶¶ 42, 59-60, Dkt. No. 35-1. On December 5, 2013, in an unrelated administrative action, the "SEC issued a ruling barring Belesis personally from, *inter alia*, associating with any 'broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization.'" *Id.* ¶ 61. Belesis is also the sole managing member of corporate plaintiff ATB Holding Company, LLC ("ATB"). *Id.* ¶¶ 10–11.

Defendant Samuel Waksal is a scientist and entrepreneur. Waksal founded Kadmon Pharmaceuticals, LLC ("Kadmon"), a biotechnology company that produces innovative medical products. *Id.* at 2 & ¶ 12. On June 10, 2003, in an unrelated criminal action, Waksal pled guilty to perjury, obstruction of justice, bank fraud, wire fraud, conspiracy to obstruct justice, and conspiracy to commit wire fraud. *United States v. Waksal*, 02 Cr. 1041, Dkt. No. 61 (S.D.N.Y. June 6, 2013) (also filed in this case at Dkt. No. 27-1). As part of a civil settlement with the Securities and Exchange Commission ("SEC"), Waksal agreed to be permanently barred from being an officer or director in a public company. *SEC v. Waksal*, 2 Civ. 04407, Dkt. No. 41 (S.D.N.Y. Jan. 31. 2005); *see also* Compl. ¶¶ 28–30.

Defendant Steven Gordon is executive vice president, general counsel, and chief administrative, compliance, and legal officer of Kadmon Pharmaceuticals and Kadmon

---

[1] Except where noted, the following facts are taken from the Proposed Second Amended Complaint, Dkt. No. 35-1 ("Compl."), and are accepted as true for the purposes of this motion. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[S]ources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss" include "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

2

Corporation. Compl. ¶¶ 14–19. Kadmon Corporation "is the parent corporation of Kadmon Pharmaceuticals"; Kadmon Holdings "is a Delaware limited liability company that is the previous name of Kadmon Corporation, LLC." *Id.* ¶¶ 16–17. The Court refers collectively to Kadmon Corporation, LLC, Kadmon Pharmaceuticals, and Kadmon Holdings, LLC, as the "Kadmon Defendants."

### B. The Securities Contracts

Plaintiffs' proposed securities fraud claims arise from two separate contracts. The first contract allegedly occurred on July 12, 2010. It involved Waksal's agreeing to sell "1000 Class B (voting) units of Kadmon Pharmaceuticals LLC to ATB Holding Company, LLC for $1.00," with the securities to be delivered "as soon as possible . . . but no later than September 30, 2010" (the "2010 Agreement"). Compl. ¶¶ 21–24; *accord* Compl. Ex. A, Dkt. 35-2. Plaintiffs allege that at the time the contract was entered into, Waksal did not intend to honor this agreement. Compl. ¶ 73(i). The proposed complaint does not contain any allegations as to the context for, or the parties' motivations for entering into, this agreement.

On March 15, 2012, Belesis contacted Waksal and asked to receive the securities that the 2010 Agreement had contemplated. *Id.* ¶ 31. In response, plaintiffs allege, "Kadmon"[2] issued Belesis a "membership certificate" for 120,000 units of Kadmon Holdings, LLC, in satisfaction of the 2010 Agreement. *Id.* ¶¶ 32-33; Compl. Ex. C, Dkt. No. 35-2. Plaintiffs allege that Belesis refused to accept this certificate and told Waksal later that day that the proffered securities were worth less than the contracted-for amount. Compl. ¶¶ 34–35; *see also* Compl. Ex. B, Dkt. No. 35-2. The following day, March 16, 2012, Belesis emailed Kenneth Goodwin, Denis Dufresne,

---

[2] The proposed complaint does not always distinguish between the various Kadmon Defendants, but instead refers to them as a unitary "Kadmon." *See, e.g.*, Compl. ¶ 32.

3

and Waksal, telling them he was returning the certificate and "request[ing] that a corrected certificate be issued." Compl. ¶ 35. As in their initial Complaint, plaintiffs do not explain who Goodwin and Dufresne are. The Court, however, assumes from context that Goodwin was Belesis's attorney, and that Dufresne was Waksal and/or Kadmon's lawyer. *See, e.g.*, Compl. Exs. B-E (exhibits containing email addresses indicative of law affiliations).

As alleged, a series of negotiations regarding the securities to be issued followed. The proposed complaint alleges four events in detail.

First, on June 29, 2012, Louis Lombardo allegedly emailed Avi Mirman, Goodwin, and Gordon, a proposed letter agreement reoffering 120,000 Class A units in Kadmon Holdings, LLC to Belesis. Compl. ¶¶ 36–39. Belesis rejected that offer. *Id.* ¶ 40. As in their initial Complaint, plaintiffs' proposed complaint does not explain who Mirman and Lombardo are. However, it appears from a publicly available newspaper article that Mirman was an investment banker working for Belesis, and Lombardo was counsel for Waksal and Kadmon.[3]

Second, on June 30, 2012, Gordon emailed Robert Bursky (acting as counsel for Belesis), Mirman, Dufresne, and Lombardo, and opined that in connection with the issuance of a Kadmon private placement memorandum, Belesis's ownership interest in Kadmon "would have to be disclosed to our auditors." Compl. ¶¶ 41-43; *accord* Compl. Ex. E at 1. Gordon also stated that "in compensation for [Belesis's] personal assistance to [Waksal] in trying to work around

---

[3] *See* Zeke Faux, *Red Bull-Fed Brokers Stand as John Thomas Draws Scrutiny*, BLOOMBERG (Jun. 19, 2016) http://www.bloomberg.com/news/articles/2013-02-25/red-bull-fed-brokers-stand-as-john-thomas-draws-scrutiny (mentioning that Mirman was an investment banker at John Thomas Financial, and that Bursky was a lawyer at John Thomas Financial); *see also Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (permitting consideration of newspaper articles for certain purposes under Fed. R. Evid. 201).

[Waksal's] [Officer and Director Bar]," Waksal would pay Belesis $15 million, and Belesis would "sign some type of release" of his other securities rights. Compl. Ex. E at 1.

Third, on July 2, 2012, Waksal sent Belesis a letter agreement in which Waksal set forth "the terms of the proposed agreement in detail." Compl. ¶ 44. The letter agreement stated that "[i]n consideration of the advisory services that [Belesis has] and will render to me personally, including your assistance and consultant regarding my director and officer bar and ability to maintain a role with Kadmon Holdings LLC," Waksal would pay Belesis an "Advisory Fee" that "shall be equal to 10% of all cash proceeds received by [Waksal pursuant to various potential Kadmon liquidity events], subject to an aggregate cap of [$15 million]." *See* Compl. Ex. F at 1–2; *accord* Compl. ¶ 45. The letter agreement contemplated that Belesis and ATB will renounce their interest in Kadmon and its respective affiliates and successors. *See* Compl. Ex. F. Belesis did not countersign this proposed letter agreement. *Id.*

Finally, "on July 5, 2012, Belesis" allegedly "accepted the [d]efendants' offer as set forth in the June 30, 2012, email and the July 2, 2012, letter." Compl. ¶ 46. Plaintiffs allege that Belesis's acceptance took the form of a signed letter dated July 5, 2012, in which Belesis stated that the "companies [Belesis] control[s]" would release their claims to Kadmon securities "except as may be set forth in those certain selling agreements between Kadmon and John Thomas Financial dated as of July 2, 2012." Compl. Ex. G; *see also* Compl. ¶¶ 49-50. Plaintiffs allege that Belesis's reference to a "July 2, 2012" "selling agreement," *see* Compl. Ex. G, incorporates the July 2, 2012 offer from Waksal, *see* Compl. Ex. F § (ii). In other words, Plaintiffs allege that, on July 5, 2012, Belesis, *inter alia*, sold his interest in Kadmon securities to Waksal for $15 million (the "2012 Agreement"). Compl. ¶¶ 48–49. Plaintiffs further allege that

5

at the time of contracting, Waksal "never intended" to "perform any part of the" 2012 Agreement. *Id.* ¶ 88(b).

After the 2012 Agreement, plaintiffs allege that in April 2013, Waksal "orally" promised to pay Belesis the $15 million. *Id.* ¶ 55. Plaintiffs also allege that in emails dated June 4, 2013, and June 14, 2013, Belesis asked Gordon and Lombardo about the $15 million. *Id.* ¶¶ 56-57.

In July 2013, JTF closed its doors, *id.* ¶ 56, and "Belesis was informed that Waksal would no longer speak to him and that he would not receive the $15,000,000 or any other sum," *id.* ¶ 58.

On December 5, 2013, the SEC issued its ruling barring Belesis from various aspects of the securities industry. *Id.* ¶ 61.

## II. Discussion

### A. Applicable Legal Standards

Under Federal Rule of Civil Procedure 15(a)(2) the Court "should freely give leave [to amend] when justice so requires." However, the "denial of leave to amend has long been held proper," for reasons such as "undue delay, bad faith, dilatory motive, and futility." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). An amendment is futile if the complaint would not survive a motion to dismiss. *See Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164 (2d Cir. 2015).

Plaintiffs' three federal claims arise under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and its implementing Rule 10b-5, 17 C.F.R. § 240.10b-5. A defendant violates these laws if he or she, "in connection with the purchase or sale of securities, made a materially false statement . . . with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP*

*Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003)).

Two background principles under § 10(b) are important here. First, when the materially false statement is the promise to perform contained in the contract itself, then securities fraud occurs only if, at the time of contracting, "the defendant secretly intended not to perform or knew that he could not perform." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993); *see also Capital Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214, 226 (2d Cir. 2012) ("Either the alleged breach must be of a character that alone provides strong circumstantial evidence of an intent to deceive at the time of contract formation or there must be allegations of particularized facts supporting a cogent and compelling inference of that intent." (quotations and citations omitted)).

Second, in a private securities fraud action, a plaintiff "must" satisfy heightened pleading standards. *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 104, 110-11 (2d Cir. 2009) (describing the "heightened pleading standards" applicable to private securities fraud claims). These arise under (1) Federal Rule of Civil Procedure 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b); and (2) the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4. This strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). A comparative inquiry is critical to assessing an inference's strength

because "[t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Id.* at 323.

B.  **Analysis of Plaintiffs' Federal Claims**

Plaintiffs' proposed complaint identifies defendants' alleged fraudulent statements as the promises to perform contained in the 2010 and 2012 Agreements. As such, to state a claim for securities fraud, the proposed complaint must plead facts giving rise to a strong inference that, at the time of contracting, "the defendant[s] secretly intended not to perform or knew that [they] could not perform." *Mills*, 12 F.3d at 1176. As explained below, as to each count, plaintiffs fail to raise a strong inference of scienter because the competing inference—that defendants decided only at a later time to breach the contract—is not only as strong but far stronger.

In Count One of the proposed complaint, plaintiffs contend that Waksal had the requisite scienter because he "never intended to honor his obligation under the August 12, 2010, securities purchase agreement." Compl. ¶ 73(i). The competing inference, that the intent to breach arose later, is stronger, because the 2010 Agreement's terms undercut the inference of scienter at the time of contracting. Specifically, under the 2010 Agreement, in exchange for the Kadmon securities, Waksal received only $1. *See* Compl. ¶¶ 21–24. Waksal received no other material consideration. If $1 was all that Waksal stood to gain, it is quite unclear why—at the time of contracting—Waksal would have perpetuated the alleged scheme. Plaintiffs' theory of scienter is that, to deprive plaintiffs of $1, Waksal engaged in a fraudulent scheme in which he agreed to deliver plaintiffs securities worth a significant sum. While it is not metaphysically impossible that Waksal intended to carry off such a fraud for such a tiny return, the far more compelling inference is that Waksal's decision to breach the 2010 Agreement developed only after contract

8

formation. Accordingly, without more, Count One of the proposed complaint does not plausibly plead a viable claim of securities fraud. *See Mills*, 12 F.3d at 1176 ("We decline [plaintiff's] invitation to infer fraudulent intent from the fact that [defendant] made a number of [securities contracts] and never performed any of them. A contract may be breached for legitimate business reasons. Contractual breach, in and of itself, does not bespeak fraud, and generally does not give rise to tort damages." (internal citation omitted)); *cf. Capital Mgmt. Select Fund Ltd.*, 680 F.3d at 226 ("[A] simple disagreement over the meaning of an ambiguous contract combined with a conclusory allegation of intent to breach at the time of execution will not do.").

In Count Two, Belesis alleges that Waksal committed securities fraud in connection with the 2012 Agreement because Waksal "never intended" to "perform any part" of that agreement. Compl. ¶ 88(b). The Court previously dismissed this claim, finding

> that the allegations only weakly suggest scienter because of the opposing inference of nonfraudulent intent—specifically, that Waksal originally intended to honor his contractual obligations, and that only after the SEC barred Belesis from working in securities did Waksal decide to breach. Indeed, Plaintiffs make this argument when they observe that the "timing" of the "definitive breach is . . . suggestive." Pl. Mem. 14, ECF No. 27. As Plaintiffs recount, because of the SEC investigation "[John Thomas Financial] closed its doors. Immediately thereafter, when it was evident that neither Belesis nor [John Thomas Financial] would be of further use to Defendants, Gordon informed Belesis that Waksal would" breach the contract. *Id.*

Sept. 29 Op. 5. In the proposed complaint, plaintiffs attempt to weaken this opposing inference by alleging that the SEC banned Belesis in December 2013, making Waksal's July 2012 breach unrelated to the SEC investigation of Belesis. Compl. ¶ 61. But this added allegation does little to undermine the strength of the opposing inference, because other allegations make clear that, as of July 2012, Belesis became of "[no] further use" to Waksal. Pls.' Mem. 14, Dkt. No. 27. Specifically, the proposed complaint alleges that, in July 2012, JTF—the financial firm that Belesis ran as CEO—closed its doors, *id.* ¶ 59. Thus, the inference that Waksal's purpose in

9

ceasing to abide by the 2012 Agreement was to take advantage of a fallen business associate remains strong.

Independently, the inference of fraud as to Count Two is not "cogent" on its own terms. *Tellabs,* 551 U.S. at 314. Plaintiffs contend that Waksal committed securities fraud in 2010 (to obtain $1), and then, instead of giving plaintiffs the securities that he owed them, embarked on a new fraudulent scheme in 2012 which he promised to pay $15 million to Belesis in lieu of these securities. But Waksal's motivation for this second, ostensible, fraud scheme is unclear. The new scheme would not have obviated Belesis's ability to sue and seek legal relief from Waksal for a breach of contract. The motive for Waksal to engage in this second scheme is therefore elusive. The first scheme stood to net Waksal just $1, and the second scheme would not vitiate the breach of contract claims that Belesis retained arising out of the 2010 and 2012 Agreements.. The proposed complaint does not coherently allege why Waksal had a motive to enter into the second agreement while ostensibly intending all the while to breach it. *See also Waxman v. Envipco Pick Up & Processing Servs.*, No. 2 Civ. 10132, 2003 WL 22439796, at *10 (S.D.N.Y. 2003) (taking into account plaintiff's sophistication when considering the requested inference of fraud).

In sum, when the Court compares the inference plaintiffs urge (that Waksal plotted an ineffective fraud against a business associate with which he had a multi-year business relationship with) with the competing inference (that Waksal breached the 2012 Agreement because Belesis was no longer useful to him), the Court finds that the proposed amended complaint does not plead, with particularity, facts that give rise to a strong inference that Waksal acted with scienter. *See* 15 U.S.C. § 78u-4. On the facts pled, plaintiffs may have a plausible state-law claim for breach of contract, but they have not adequately pled a securities fraud.

Accordingly, Count Two of the proposed complaint does not state a viable claim for securities fraud.

Count Three alleges essentially the same fraud as Count Two—*i.e.* fraud with respect to the 2012 Agreement. It is different in that it includes all defendants. *See* Compl. ¶¶ 93–100. Adding these defendants does not, however, make more cogent the inference plaintiffs must plead that any defendant had the intent to deceive plaintiffs during the time the 2012 Agreement was formed. Count Three thus must be dismissed for the same reasons as Count Two.

### C. State Law Claims

The remaining claims in plaintiffs' proposed second amended complaint are based on supplemental jurisdiction and are substantively unchanged from the previous complaint. The Court previously declined to exercise supplemental jurisdiction over these claims. Sept. 29 Op. 6. Because the proposed complaint still fails to provide a basis to exercise original jurisdiction, the Court again declines to exercise supplemental jurisdiction. *See Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[A] district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" (quoting 28 U.S.C. § 1367(c)(3))). Plaintiffs are at liberty to pursue such claims in state court.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion to amend is denied. The Clerk of Court is respectfully directed to terminate the motion at Dkt. 35 and to close this case.

SO ORDERED.

_____
Paul A. Engelmayer
United States District Judge

Dated: April 18, 2017
      New York, New York